IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **MICHAEL KEVIN ADAMS, #02101338** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.  4:21cv207** |
| | § | |
| **DIRECTOR, TDCJ-CID** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner Michael Kevin Adams, an inmate confined in the Texas prison system, with the assistance of counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to United States Magistrate Judge Kimberly C. Priest Johnson for findings of fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge.

## I.  PROCEDURAL BACKGROUND

Petitioner is challenging his Collin County conviction, Cause No. 366-81115-2014. On November 4, 2016, a jury found Petitioner guilty of capital murder. (Dkt. #10-85, p. 34). The trial court assessed punishment at the mandatory sentence of life imprisonment without parole. (Dkt. #10-85, p. 34).

Petitioner appealed his conviction, which was affirmed on May 24, 2018. *Adams v. State*, No. 05-16-01361-CR, 2018 WL 2355280 (Tex. App. May 24, 2018). Petitioner filed a petition for discretionary review ("PDR") (Dkt. #10-9), which the Texas Court of Criminal Appeals ("TCCA") refused on October 31, 2018. *Adams v. State*, PDR No. 0637-18. The United States Supreme Court denied Petitioner's petition for writ of certiorari on March 25, 2019. *Adams v. Texas*, 139 S. Ct. 1384 (2019).

1

Petitioner, with the assistance of counsel, filed an application for state habeas corpus relief on February 27, 2020. (Dkt. #10-85, pp. 85-107). On August 25, 2020, the state habeas court entered findings of fact and recommended Petitioner's application be denied. (Dkt. #10-88, pp. 122-39). On February 24, 2021, the TCCA denied the application without a written order. (Dkt. #10-83).

Petitioner, with the assistance of counsel, filed the instant petition (Dkt. #1) on March 18, 2021. Petitioner asserts the following claims for relief:

(1)    The evidence is legally insufficient to support Petitioner's conviction.

(2)    Petitioner received ineffective assistance of counsel when trial counsel failed to object to the admission of "touch DNA" evidence.

(3)    Police officers' warrantless impoundment and inventory search of Petitioner's truck was unreasonable.

(Dkt. #1, pp. 6-7; Dkt. #3). The Director filed a response, arguing Petitioner's claims are without merit. (Dkt. #9). Petitioner filed a reply. (Dkt. #11).

## II.  FACTUAL BACKGROUND

The Fifth District Court of Appeals set out the facts as follows:

### I. FACTUAL AND PROCEDURAL CONTEXT

The indictment in this case alleged in part that on September 9, 2013, appellant intentionally caused the death of the complainant, N.L., by shooting her with a firearm while "in the course of committing or attempting to commit the offense of retaliation" against her.

#### A. Pretrial Motion to Suppress Results of Inventory Search of Vehicle

Prior to trial, appellant filed a motion to suppress evidence found during a September 10, 2013 inventory search of his truck. In that motion, appellant contended the inventory search (1) "was unlawful because it was not conducted in good faith, but was instead conducted as a ruse to look for evidence of a crime"; (2) "was not conducted pursuant to a valid inventory search policy"; and (3) "exceeded the scope of any inventory policy in effect."

2

At a pretrial hearing on that motion to suppress, Reuben Mankin testified he is employed as a Texas Ranger with the Texas Department of Public Safety ("DPS"). On September 9, 2013, he was asked to assist in investigating the homicide in question. According to Mankin, appellant became a suspect "right away" based on events that had occurred earlier in the year involving him and N.L. After viewing the crime scene, Mankin drove to appellant's residence in Frisco, Texas, to "establish surveillance."

At some point the following morning, Mankin observed appellant leaving his residence in a white truck with no front license plate. Mankin contacted Frisco police officer Brian Sartain to "get a traffic stop" based on the missing license plate. Mankin stated he was not intending for appellant to be arrested on that license plate violation, but rather, his intent "was for [appellant] to be stopped and for us to be able to approach him and talk to him about [the homicide] on a voluntary basis." When the traffic stop was conducted, appellant pulled into a parking space in the parking area of a McDonald's restaurant. At that point, Frisco police arrested appellant for a "registration violation" and he was taken into custody at that location.

Mankin stated that when he arrived at that location and learned of appellant's arrest, he "knew that since [appellant] was placed under arrest that there was going to be an inventory of his vehicle," "[p]er whatever Frisco policies were." Mankin told Sartain that if the police saw anything related to the homicide during the inventory search of the vehicle, they were to "back out" so a search warrant could be secured. Frisco police proceeded with the inventory search of appellant's vehicle, but stopped when Sartain observed a small silver screw in the "front area" of the vehicle. Mankin testified the screw found in appellant's vehicle "appeared to be a grip panel screw" from the handle of a handgun. Mankin stated that at that point, the vehicle was impounded and a search warrant was obtained. Appellant was transported to the Frisco jail. On cross-examination, Mankin testified in part that when he initially contacted police respecting the traffic stop, "[m]y goal was to bring [appellant] in voluntarily and talk to him."

Sartain testified he is a patrol officer with the Frisco Police Department. He stated that when he arrived at the scene of the traffic stop described above, other officers were "conversing with the driver, getting him out of the vehicle." Sartain stated (1) police were not "searching for evidence of a crime when the vehicle was impounded," (2) the "inventory process" in this case was not "a ruse or some kind of trick to be able to find evidence in that truck without a warrant," and (3) the purpose of inventorying a vehicle before impoundment is "[t]o log and identify the contents of a vehicle for the safekeeping of property." Additionally, Sartain testified (1) "Frisco Police Department policy" allows police the discretion to "either impound the vehicle or not" when an individual driving a vehicle is arrested, and (2) he "typically" impounds vehicles when he makes an arrest because "if the guy comes back and has to stay in jail for a month," a vehicle parked in a parking lot can be "towed off by the property management" or "broke into," or "the person

3

may even claim that there were things taken out of his vehicle and now I'm on the hook for that."

On cross-examination, Sartain testified in part (1) the impoundment in this case was consistent with "the City of Frisco police policy" and (2) the arrest of appellant was "a high-risk arrest" that "involved many officers," some with "weapons drawn," based on the fact that appellant was "a person of interest or a suspect in a homicide." Further, Sartain was asked on cross-examination, "As far as the vehicle being involved in any type of a crime other than the display of no front license plate, there's no reason to believe that it was involved in anything other than that offense, correct?" Sartain stated, "Yes, sir, as far as I know."

Following the presentation of that testimony and arguments of counsel,[1] the trial court denied appellant's motion to suppress the results of the inventory search of his truck.

> [FN1] During argument on the motion to suppress, counsel for appellant argued the inventory search in question was not "conducted in good faith and under a reasonable standardized police procedure." Additionally, counsel for appellant cited *Josey v. State*, 981 S.W.2d 831, 842 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd), and stated in part,
>
> > Both of the officers confirm that the vehicle, where it was parked, was not impeding any flow of traffic, that it was not a danger to public safety in any way, and that otherwise it was lawfully parked. There was nobody from McDonald's or any other person with an ownership interest in the lot came and told them that the vehicle needed to be removed, it could not stay there. In other words, it was okay to stay where it was. I think the evidence is clear on that. The evidence is also clear that they never inquired of Mr. Adams of whether or not he wanted someone to come take the vehicle instead of it being impounded.
> >
> > . . . .
> >
> > *Josey* at 842 states that "Factors that may be considered to determine the reasonableness of impoundment are, one, whether someone was available at the scene of the arrest to whom the police could have given possession of the vehicle; two, whether the vehicle was impeding the flow of traffic or was a danger to public safety; three, whether the vehicle was locked; four, whether the detention of

4

the arrestee would likely be of such duration as to require police to take protective measures; five, whether there was some reasonable connection between the arrest and the vehicle; and, six, whether the vehicle was used in the commission of another crime."

I don't believe there's any evidence that's been testified to that would substantiate that any of the factors that would weigh in favor of this being an unlawful [sic] impoundment of this vehicle were ever present.

### B. Trial

The trial on the merits transpired over six days. Thirty-three witnesses testified. That testimony is described below.

Scott Greer testified that at the time of the events in question, he was employed as a detective with the Frisco Police Department. On March 6, 2013, he was assigned to investigate a sexual assault involving N.L. Greer stated N.L. identified her assailant as appellant, who was her former fiancé. N.L. told Greer that on March 4, 2013, she and appellant were no longer engaged or dating. At approximately noon that day, she arrived at appellant's house in Frisco to pick up some belongings. Appellant invited her to have lunch with him and she agreed to do so. N.L. told Greer that after eating a few bites of the pasta appellant served to her, she felt very tired and dizzy and surmised appellant had put drugs in her food. Greer stated N.L. described to him a sexual assault by appellant that occurred while she was under the effect of the drugs. N.L. was conscious, but was unable to "fight him off" because she was drugged. Appellant took photographs of her during the sexual assault. After that assault, she was handcuffed, "hogtied" with rope, and left naked for hours on a blue tarp in appellant's garage. She passed out several times. At one point during the night, appellant loosened the rope slightly and N.L. managed to run outside, still naked, and reach a neighbor's house. She banged on the neighbor's door, but before anyone answered, appellant caught her and tied her up again. She asked appellant whether he was going to kill her and he said he did not know. Eventually, N.L. convinced appellant she still loved him and would not go to the police if he released her. Appellant released her the following day and she drove directly to the Frisco police station.

Greer testified appellant was arrested on March 6, 2013, and criminal charges were filed against him. Also, police searched appellant's house and car and found evidence consistent with N.L.'s account of the assault she described. Appellant posted bond in that case and was released. Subsequently, appellant was indicted in that case on September 27, 2013.

5

Greer stated he resigned from the Frisco Police Department in approximately late September 2013. He stated the reason he resigned was that during the investigation of N.L.'s death, it "came to light" that he had conducted an "inappropriate relationship" with her starting in June 2013, while the investigation of the sexual assault described above was ongoing. Also, he conducted inappropriate relationships with several other women connected to cases he was investigating. Greer testified he exchanged sexually explicit emails with N.L., but they never had a physical relationship.

On cross-examination of Greer, numerous sexually suggestive and explicit email messages between him and N.L. were admitted into evidence and published to the jury. Additionally, Greer stated on cross-examination that in September 2013, the vehicle he was driving as his personal vehicle was "a two-tone truck, maroon and beige," with "beige at the bottom."

According to Greer, on March 7, 2013, N.L. obtained an emergency protective order against appellant that prohibited him from having any contact with her. On April 4, 2013, N.L. reported to Frisco police that appellant had violated that protective order. Specifically, N.L. told police her mail was stolen and appellant left a hand-written letter in her mailbox that was not postmarked. The letter was signed by appellant and sprayed with his cologne. N.L. told police she felt "terrified and harassed by the letter" and she and her son were trying to "find shelter elsewhere." In June 2013, N.L. and her son moved from Frisco to Melissa, which is approximately twenty miles from Frisco.

Sergeant A.J. Jumper testified he is a criminal investigator with the Collin County Sheriff's Office. He stated that on September 9, 2013, he was called to investigate a crime scene at 3006 Maple in Melissa. He arrived at the scene shortly after 5 p.m. He took photographs of the interior and exterior of the house at that location and collected evidence from the master bedroom, where the body of N.L. was found. She had been shot twice in the head. She was stretched out on the bed, naked from the waist down. Her underwear was around her right ankle and the tank top she was wearing had been pulled up, exposing her chest. Jumper testified he saw no sign of forced entry at the house.

Jumper stated the evidence he collected included, in part, (1) two condom wrappers that were in the toilet in the master bathroom, (2) a green condom found in the wastebasket in the master bathroom, (3) a yellow condom found wrapped in a towel in the master bedroom, (4) two "spent" .22-caliber cartridge casings, one of which was found on the bed in the master bedroom and one of which was found beneath that bed, and (5) swabbings from the body of N.L. and various locations in the master bedroom and bathroom. That evidence was sent to a Garland crime laboratory operated by DPS to be tested for DNA and other substances. Also, N.L.'s bedsheet and clothing were sent to that lab for analysis. Photographs taken by Jumper of the house and the evidence collected were admitted into evidence and published to the jury.

According to Jumper, there was a substance that appeared to be blood on the rim of the toilet bowl in the master bathroom and on the faceplate of the light switch located just to the right of the doorway inside that bathroom. Jumper collected swabbings of that substance and sent them to the Garland crime lab described above. Additionally, Jumper testified the wastebasket in which the green condom was found was located next to the toilet in the master bathroom. He testified the wastebasket was small and had "a plastic liner in it, kind of like a garbage can liner." He stated that at the time he first saw the wastebasket, it was more than halfway filled with trash. The edge of the green condom could be seen near the top of that trash before any of the items of trash were moved. Photographs of the wastebasket as it appeared before any of the items of trash were moved were published to the jury.

Dr. William Rohr testified he is the medical examiner for Collin County. He stated he performed an autopsy on N.L.'s body and determined her death was caused by "two gunshot wounds to the head." On cross-examination, Rohr testified he "really can't tell" the time of death. He stated N.L.'s body was found at 4:28 p.m. on the date in question.

N.L.'s son, Trey, testified he and N.L. moved in with appellant during the time N.L. and appellant were engaged. He stated appellant was "obsessive-compulsive" and kept his house "incredibly neat and orderly." Further, he stated appellant had an "obsession" with N.L.'s body and kept a topless photograph of her on his nightstand with two candles next to it.

Trey testified that on the date of the March 2013 sexual assault described above, he received a text message on his phone that appeared to be from his mother. That message stated she was "going to spend a few nights" with a man she had been seeing named "Kevin" and if she did not respond to contact from Trey, it was because her phone battery was almost dead. Trey testified he later learned from his mother that appellant had sent that message from her phone.

According to Trey, he and his mother moved to Melissa in June 2013 "mostly to escape [appellant]." Trey testified N.L. told him, "I know he's going to find me and I know he's going to kill me." A "couple of weeks" before his mother's death, Trey found a "blue tarp with a set of handcuffs on top" on the front porch of their house in Melissa. Based on what his mother had told him, he knew those items were similar to items used in the sexual assault by appellant. He stated that both he and N.L. were "fearful." Further, he testified that "closer to September 9th," N.L. "was resigned that she was going to get killed by [appellant]" and "[i]t was almost like she gave up."

Trey stated that at the time of his mother's death, he was a junior in high school. Before leaving for school on the day of the murder, he went into his mother's bedroom and saw her sleeping. He stated there was no one else in the house. He

7

kissed N.L. on the forehead and said, "Love you. See you when I get home." He stated she was "drowsy" and responded, "Bye. I love you." Trey left the house through the front door at approximately 8 a.m. and locked that door. He testified he arrived home from school at approximately 4:30 p.m. Trey stated he believes the front door was unlocked. He entered the house and called to his mother. When she did not answer, he assumed she was sleeping. He went to her bedroom and found the door locked. He "peeked under the door" and "saw her foot hanging off the bed." Then, he picked the lock and discovered his mother's body as described above. He ran outside and called 9-1-1.

Michael Groettum testified he is a police officer with the City of Melissa Police Department. He testified that following the death of N.L., he obtained phone records pertaining to a cell phone number registered to appellant. Groettum stated those records showed six phone calls on September 9, 2013, with the first occurring at 11:13 a.m. in Frisco. Groettum "mapped" the locations of the "cellular towers" linked to those calls and concluded there was not any time that day "where [appellant's] phone was hitting off of the cell tower that was closest to [N.L.'s] home in Melissa." Additionally, Groettum testified he "made the observation that [appellant's] phone was used 9 times in the 11 days prior to September 9th," which Groettum stated "[l]ed me to believe that there could possibly be another cellular phone."

Teresa Sauceda testified that at the time of the homicide in question, she was employed at Southwest Collateral Recovery, which provides assistance in the repossession of motor vehicles. One of her coworkers was appellant, who was the company's office manager at that time. She stated she and appellant had a "friendly working relationship." Sauceda testified that on Friday, September 6, 2013, she was in appellant's office and saw him looking at a photo of N.L.'s face on his phone.

Mankin testified that when he arrived at N.L.'s home on the date of the homicide in question, other law enforcement officers were already present. He stated (1) the yellow and green condoms described above "matched up" with the two condom wrappers found in the toilet and (2) the "edge of the green condom" can be seen in the photographs of the wastebasket taken before any of the items of trash inside were moved.

Additionally, Mankin described the inventory search of appellant's vehicle and testified that on that same date, he and other law enforcement officers conducted a search of appellant's residence. Numerous miscellaneous items related to firearms, including several empty gun cases, were found at appellant's home. However, no firearms were found. Mankin stated appellant was a "licensed federal firearms dealer," but "had been ordered to get rid of his guns because of that protective order" obtained by N.L. in March 2013. On a shelf inside the master bedroom closet, a packet containing "developed photographs" was found. One of those photographs showed two .22-caliber firearms, both of which were "suppressed." Mankin testified suppression "muffles out the sound of the firearm."

According to Mankin, a "lot of people" were interviewed by the law enforcement officers investigating this case in an effort to determine the source of "unaccounted-for" male DNA found at the crime scene. He stated N.L. worked at a "gentlemen's club" and police investigated men who were "closely associated with her" through that job and "would have contact with her." Mankin testified all of those men were "eliminated" because their DNA "did not match" that collected at the crime scene.

Mankin stated appellant gave a voluntary statement to police respecting his whereabouts on the date of N.L.'s death. According to Mankin, appellant stated he woke up at approximately 9:15 a.m. that day and went for a two-mile walk, then took a shower and trimmed bushes in his yard. Also, appellant "went into vivid details about exactly what he did after noon." Mankin stated police were unable to "corroborate anything that he said about what he did with his morning."

Additionally, Mankin met with appellant's ex-wife, Gina Noble, and her attorney. On September 27, 2013, Noble gave written consent for a search of a storage unit leased by her. In that storage unit, Mankin found firearms, ammunition, and firearm accessories, including a silver gun case that "resemble[d] the case that's in the photograph that we saw that contained the two firearms at [appellant's] residence." The gun case in the storage unit contained miscellaneous firearm accessories, including one suppressor, but did not contain the .22-caliber guns pictured in the photograph.

Mankin testified that during his investigation of N.L.'s death, he learned that at the time of the events in question, the house where N.L. lived had been undergoing painting and remodeling by contractors. Several days after the shooting, the contractors informed police that the lock on one of the windows in the master bedroom was not secure because "[t]he screws had been taken out." Mankin stated that at the time he viewed the crime scene on the date of the shooting, the windows were covered from the inside by "sheeting material" that was stapled to the interior window sills. Further, he stated (1) the sheeting material would "have to be disrupted" in order for someone to get in or out of a window and (2) there was no indication that the sheeting material was "untacked" when he saw the crime scene on the date of the shooting.

Additionally, Mankin stated his investigation revealed emails between N.L. and Greer that showed Greer's inappropriate relationship with N.L. Mankin stated Greer told him he had visited N.L.'s house in Melissa twice, once in July and once in August. Also, Mankin stated Greer's timesheets showed that starting at 8:15 a.m. on the date of the shooting, he was working at a school in Frisco.

On cross-examination, Mankin testified (1) footage from a video surveillance camera at a Home Depot store in Frisco shows appellant in that store at approximately 1:30 p.m. on the date of the shooting, (2) a receipt provided by appellant shows he made a purchase at approximately 1 p.m. that day at a Bath &

Body Works store in Frisco, and (3) neighbors of appellant saw him working in his yard that afternoon. Also, Mankin stated that when he visited the crime scene on the date of the shooting, he did not examine the windows in the master bedroom or try to look behind the sheeting material on those windows. Additionally, Mankin stated (1) analysis of vaginal swabbings of N.L. showed a DNA profile that was interpreted as a mixture of the DNA of N.L. and one unknown male; (2) analysis of anal swabbings from N.L. showed a DNA profile that was interpreted as a mixture of the DNA of N.L. and one unknown male; and (3) swabbings from the inside of the yellow condom showed DNA that originated from a single unknown male.[2] The individuals "excluded" as contributors respecting that DNA included appellant and Greer. Further, Mankin stated (1) the green condom described above was partially "inside out" when it was found, and thus the surface of the condom facing outward when it was found was actually the interior portion of the condom; (2) analysis of the outward-facing surface of the green condom showed DNA that was "interpreted" as a mixture of that of the victim and either two or three other individuals; (3) DNA of "epithelial cells" found on the outer-facing surface of the green condom "comes back to [appellant]" and thus he is one of those two or three other individuals; (4) DNA analysis showed it was "inconclusive" whether Greer or any of six other men identified by police who were associated with N.L. could be contributors respecting the other DNA on the outward-facing surface of the green condom; (5) DNA on the inward-facing portion of the green condom was interpreted as a mixture of that of N.L. and two males, neither of which was appellant or Greer, and (6) the fact that the DNA testing of evidence at the crime scene, including the inward-facing portion of the green condom, was "inconclusive" as to N.L.'s son was not surprising to Mankin because "he's living in the house so he's coming into contact with things that may have done that," such as bedding or "something in the trash." According to Mankin, (1) the "DNA findings" of "epithelial cells from a condom found in the trash can that came from [appellant]" "would put [appellant] at the crime scene" and (2) he rejected "the idea that [appellant's] DNA might be there as a result of cross transference" because "[appellant and N.L.] had been away from each other for hundreds of days at that point" and the wastebasket "had what appeared to be fresh trash in it, so there was no good reason for his DNA to be there."

> [FN2] The results of the DNA analysis did not include a determination of whether any of the DNA at the crime scene from "unknown" individuals was from the same person.

Also, counsel for appellant asked Mankin whether he formed a theory about the "time frame as to when this occurred." Mankin testified (1) "there's a strong possibility" N.L.'s sexual encounter from which the evidence described above resulted "could have happened early that morning" after Trey left for school; (2) also, there was "a possibility" it could have taken place prior to that time; (3) the medical examiner is "not putting a time frame as to when [the shooting] occurred"; and (4) Mankin's theory is that the sexual encounter and murder "did occur in the morning hours just before noon." Further, Mankin stated (1) Trey gave a statement

10

in which he said that on the night preceding N.L.'s murder, he slept on a couch in the living room; (2) the living room is located such that "somebody [would] have to walk past him to get to the bedroom"; and (3) Trey did not report seeing any men entering N.L.'s bedroom on the night of September 8 or the morning of September 9.

Kimberlee Mack testified that at the time of the events in question, she was a DNA analyst with the DPS crime lab in Garland. She analyzed DNA samples pertaining to the sexual assault and homicide described above and prepared reports summarizing her analyses. Mack stated that on the "outside" of the green condom, she found a mixture of DNA from N.L., appellant, and an unknown "additional contributor." Further, Mack (1) stated epithelial cells are skin cells and can be "separated out" from other types of cells, such as sperm, and (2) described the process and procedures she used to analyze the DNA in question.

On cross-examination, Mack testified (1) the DNA from the March 2013 sexual assault described above was not analyzed until after the September 2013 homicide occurred; (2) the presence of a person's DNA in a location "doesn't mean that person was there" or "tell us how it got there"; (3) it is possible DNA can be "picked up" by items that touch it and deposited from those items onto other surfaces; (4) depending on variables such as temperature, DNA can remain on an item "years and years after it was left there"; and (5) contamination of DNA from one case with DNA from another case can occur in a lab.

Melissa Haas testified she is the DNA section supervisor with the DPS crime lab in Garland. She stated that on October 16, 2013, there was an incident at the lab "in which some samples with regard to this case were destroyed." Specifically, according to Haas, "while a batch of samples was placed on the robotic platform for extraction, the deep-well processing plate was inadvertently left off of the platform" and "instead of the DNA extracts going into this plate, they actually were disbursed over the deck of the instrument." As a result, the swabbings described above from the rim of the toilet bowl and the faceplate of the light switch in the master bathroom were "lost." Further, Haas stated that immediately after that incident, the robotic platform and surrounding area were decontaminated and she is "confident" future samples processed with that same instrument were not contaminated.

On cross-examination, Haas testified lab records show that on September 23, 2013, evidence from each of the two cases described above, including the green condom, was examined by the same forensic biologist at the lab. The lab records do not show what time the examination of each piece of evidence was conducted. Haas stated (1) based on laboratory protocols, "[n]o cases are to be out at the bench at the same time" and (2) pursuant to lab policy, the work area would have been decontaminated before starting any work pertaining to the second case.

11

Christie Cheng testified she is the forensic biologist who examined evidence from both crimes described above at the DPS crime lab on September 23, 2013. She stated (1) "a hundred percent of the time" she follows the lab policy of "opening up" only one item at a time; (2) "before opening another item, we will seal the item, bleach the bench top, change out paper, change gloves before proceeding to the next item"; and (3) on September 23, 2013, she did not leave one item open and then open up another item from another case at the same time.

Amber Moss testified she is a forensic scientist at the DPS crime lab in Garland. In 2016, she performed a "re-analysis and re-interpretation" of the evidence from both crimes described above, using "newer techniques" than were used in the original analyses. Moss testified that although the analysis of the DNA on the outward-facing surface of the green condom "looked like it was potentially a three-person mixture," it "possibly is a four-person mixture" and "we don't know which it truly is." She stated that, regardless, her testing indicated N.L. and appellant are two of the persons whose DNA is in that mixture.

Richard Gary Cox testified he is N.L.'s father and lives in Florida. He stated that in mid-August 2013, N.L. and Trey came to stay with him for a week because N.L. was "getting concerned" about "problems she was having with the assault charge and rape charge." N.L. told him the person who raped her was appellant. Further, Cox stated N.L. told him (1) appellant "had called her up and said, 'You better not testify or I'll kill you, bitch. You won't live,' that kind of statement, several times"; (2) she was "scared to death" because appellant had "found her" and left a tarp and handcuffs on her porch; (3) appellant had told her that he "works with the police all the time" in doing vehicle repossessions and he "knows their ins and outs" and "they can't do shit"; and (4) she believed appellant was going to kill her and told Cox "[i]t's obvious that they can't protect me."

Adam Unnasch testified that at the time of the events in question, he was a research specialist with DPS. He stated that in connection with the investigation of the homicide in question, he analyzed cell phone records from April 2013 through September 2013 for a cell phone associated with appellant. Unnasch testified the records showed (1) appellant did not use his cell phone at all for calls or text messages on Saturday, September 7, 2013, and Sunday, September 8, 2013, and (2) on Monday, September 9, 2013, appellant did not use his cell phone prior to 11:13 a.m.

Chris Meehan testified he is an investigator for the Collin County Sheriff's Office and specializes in computer forensics. He stated that in connection with the homicide investigation in question, he examined the "Internet search history" for appellant's workplace computer. According to Meehan, between September 1, 2013, and September 6, 2013, multiple searches were conducted on that computer under appellant's user name for GPS coordinates that corresponded to the location of N.L.'s home and areas within approximately one mile of that location.

12

After the State rested its case, appellant moved for a directed verdict. That motion was denied by the trial court. Then, the defense called several witnesses.

Jonathan Chase Simmons testified that on the date of the shooting in question, he was a sophomore in high school and lived next door to N.L.'s home. At approximately 8:15 that morning, as he was pulling out of his driveway to go to school, Simmons saw a vehicle he had never seen before parked outside of N.L.'s home. According to Simmons, the vehicle was "a slightly older model truck" with a "red over/white under paint job." Simmons testified there was a person in the driver's seat who "appeared to be trying to recline or slink down" in order to "keep from being seen in the truck." Simmons stated he could not see that person's face. Additionally, Simmons testified there was a metallic sunshade in the front windshield, which seemed "odd" to him because the truck was "facing the opposite direction of the sun."

Robert Aguero testified he is the owner of a business that performs cell phone forensics and cell tower data analysis. He stated he analyzed the cell phone records of appellant from April 2013 through September 2013. According to Aguero, (1) "[o]ut of those 162 days, 72 of those dates there were either no phone calls made whatsoever or there were no calls made prior to 11 a.m." and (2) "in essence, 44 percent of the time there were no calls prior to 11 a.m."

Steven Alexander testified that on the date of the shooting in question, he lived in a house that was "one behind and three down" from N.L.'s home. At approximately 1:30 p.m., he was upstairs in his house and heard two loud "boom sounds" about five to eight seconds apart. He stated his first thought was that "it sounded like a gun." He testified he has "a habit of putting things in my phone when something odd happens" in order to "make a note of it" and he did so at that time. Further, he stated there was construction going on "to the addition behind us" that sometimes involved loud banging noises, but the sound he heard "was just a louder, different, deeper sound." On cross-examination, Alexander testified that when he was interviewed by a deputy about the noises in September 2013, he (1) told them he assumed the noises were from construction close to his home and (2) did not say anything to the deputy about gunshots.

Kyle Babcock stated he is the captain of the City of Melissa Police Department and was the lead investigator in the homicide case in question. He testified in part (1) DNA "can get on an object in a lot of different ways"; (2) appellant and N.L. "stay[ed] at each other's homes" during the time they dated and it is possible "[appellant's] DNA would be on some of [N.L.'s] items"; (3) the green condom in the wastebasket described above was visible before any other items were removed and was "right on top of the . . . fresh trash"; (4) he believes N.L.'s sexual encounter that resulted in the evidence described above happened either after Trey left for school "[o]r the previous day"; and (5) he spoke with the deputy who interviewed Alexander about the sounds he heard and "we believed what he heard at the time was construction noises from the subdivision being built behind [N.L.'s]

13

residence." On cross-examination, Babcock testified (1) the fact that the green condom "was found toward the top of the trash" and "the wrapper for that condom [was] in the toilet water" indicated to him that the amount of time the condom had been there was "[n]ot long"; (2) that condom is "the one thing that has [appellant's] DNA on it"; and (3) dove hunting season begins on approximately September 1 each year and a shotgun blast from a dove hunter "would carry" from nearby farmland areas and be audible in the neighborhood where N.L. lived.

Dr. Greg Hampikian testified he is a biology professor at Boise State University and does "private DNA consulting." He stated that through "transfer," it is "possible for DNA from someone to appear in a location where that person has never ever been." Additionally, he testified in part as follows:

> Q. Now, the idea of transfer from something at the crime scene, for example, like a bedsheet that had been shared by two individuals sometime in the past, and a DNA sample collected from that bedsheet sometime in the future, is it—it is possible that DNA can stay around for a long time on like a sheet or something like that?
>
> A. Yeah. I mean, I have—so I have casework that's, as I said 20, 30 years old. DNA does stay around. Now, if something is washed in really good detergent and bleach, you're probably going to get rid of most of the DNA. That doesn't mean it might not show up by the time you get it to the lab. It might touch the washing machine on the way out where some dirty clothes hit the rim and your clean sheet hits it. It's very hard to keep things completely free of DNA even in the lab where we're scrubbing and we're spraying bleach, et cetera. But that's not to say that it doesn't decrease with washing.
>
> . . . .
>
> Q. All right. Ask you to assume something in regards to the trash can. That it had been used over a period of time that included a time period when the homicide occurs and included a time period before that when two people use the same trash can. Is there a likelihood or is there ability for DNA to have survived in a trash can and then it to be transferred to an item that later gets in the trash can?
>
> . . . .
>
> A. Yeah, I mean, in bedrooms and bathrooms and just common sense that's where we put a lot of our biological material. So if you have a sexually active couple, there are 360 billion sperm cells in an ejaculate. Not all of them walk out of that room. Some of them end up on sheets, some of them end up on Kleenex, some of them end up on condoms. And so certainly bedrooms and bathrooms, we see

14

> a lot of biological staining in baskets. . . . Not many of us bleach our garage [sic] receptacles and if you have a wet stain and if it has blood or saliva or semen or mucus on it, it transfers quite easily. We've all seen wet tissue stick to a surface. So there's a lot of transfer that would occur in garbage cans, particularly those that are in bedrooms or bathroom.

During closing argument, the State argued on rebuttal, in part,

> You heard Ranger Mankin talk about the screw. He looked down in the truck and he sees what he recognized to be a grip screw from a gun. Now, this button down, cover your tracks, [sic] took his weapon apart after the murder. The truck is pristine, but he made a mistake and dropped one screw when he was disposing of that weapon.

Appellant objected to that argument on the ground that the prosecution was "arguing facts not in evidence." That objection was overruled by the trial court. . . .

*Adams*, No. 05-16-01361-CR, 2018 WL 2355280, at *1-10.

### III.  STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The

new provisions of § 2254(d) provide that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's

16

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* at 98.

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Thus, a state application that is denied without written order by the TCCA, as in the present case, is an adjudication on the merits. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472. Where the decision is a summary denial or affirmance, however, a "federal [habeas] court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."[1] *Wilson v. Sellers*, 584 U.S. ___, ___, 138 S. Ct. 1188, 1192 (2018).[2]

---

[1] The Director may rebut this presumption by showing that the most recent state court's unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were argued or supported by the record that the state court reviewed. *See Sellers*, 584 U.S. at ___, 138 S. Ct. at 1192; *Wesson v. Dir., TDCJ-CID*, No. 1:19-CV-00187-H, 2022 WL 3928513, at *3 (N.D. Tex. Aug. 30, 2022), *appeal dismissed sub nom. Wesson v. Lumpkin*, No. 22-10990, 2023 WL 2881423 (5th Cir. Mar. 10, 2023).

[2] *See also Miller v. Dir., TDCJ-CID*, No. 3:20-CV-388-D-BN, 2021 WL 6339551, at *7 (N.D. Tex. Nov. 1, 2021) ("While the TCCA did not issue a written opinion, pursuant to the 'look through' doctrine, this Court can look to the detailed findings of the state habeas trial court to glean the TCCA's reasoning."), *report and recommendation adopted*, No. 3:20-CV-0388-D, 2022 WL 93934 (N.D. Tex. Jan. 10, 2022), *certificate of appealability denied sub nom. Miller v. Lumpkin*, No. 22-10081, 2022 WL 2913760 (5th Cir. July 12, 2022); *Kinslow v. Dir., TDCJ-CID*, No. 5:17-CV-171, 2020 WL 7366353, at *6 (E.D. Tex. Nov. 4, 2020) ("Although the Texas Court of Criminal Appeals did not address this claim in the Order denying relief, this Court must 'look through' the Court of Criminal Appeals' unexplained decision to the [state habeas trial court's] 'relevant rationale' for the denial of the claim, presuming the higher court 'adopted the same reasoning.'") (citing *Wilson*, 584 U.S. at ___, 138 S. Ct. at 1192), *report and recommendation adopted*, No. 517CV00171RWSCMC, 2020 WL 7364603 (E.D. Tex. Dec. 15, 2020); *Martinez v.*

In addition to the standard of review imposed by the AEDPA, the petitioner must also show any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht*. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original).

Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

### IV. ANALYSIS

**A. Sufficiency of the Evidence (Ground One)**

---

*Stephens*, No. CIV.A. H-13-3729, 2015 WL 1097372, at *7 (S.D. Tex. Mar. 11, 2015) (where the TCCA denied without written order the petitioner's state habeas application, and the state habeas court entered detailed findings of fact and conclusions of law regarding the petitioner's claims, the federal court "looks through" the TCCA's order to the state habeas court's decision—the last reasoned opinion on the matter); *Gavin v. Stephens*, Civil Action NO. H-14-0501, 2014 WL 5426483, at *4 (S.D. Tex. Oct. 21, 2014) (applying "look through" doctrine to state habeas trial court's finding of fact when the TCCA denied relief without written order).

In Ground One, Petitioner contends the evidence was legally insufficient to support his conviction. (Dkt. #1, p. 6; Dkt. #3, pp. 14-18).

Petitioner raised this issue on direct appeal. The Fifth District Court of Appeals considered the issue and found the evidence to be sufficient under *Jackson*:

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

We apply *Jackson v. Virginia*, 443 U.S. 307 (1979), as the standard for reviewing the sufficiency of evidence. *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). "In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011)); *see also Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper."). Further, when viewing the evidence in the light most favorable to the verdict, "the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Winfrey*, 393 S.W.3d at 768 (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)).

We permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). The jury is not permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Merritt*, 368 S.W.3d at 525-26.

Circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13. "In circumstantial evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App.

19

1993)). Although motive and opportunity are not elements of murder and are not alone sufficient to prove identity, they are circumstances indicative of guilt. *Id.* at 360.

### B. Applicable Law

Section 19.03(a)(2) of the Texas Penal Code provides in part that a person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit retaliation. TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2017). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* § 19.02(b)(1).

### C. Application of Law to Facts

In his first issue, appellant asserts the evidence is insufficient to prove beyond a reasonable doubt that he murdered N.L. According to appellant,

> [M]otive and opportunity are not sufficient to prove guilt. And in [this] case, the State's only other evidence—touch DNA from [appellant] that may or may not have been left in [N.L.'s] home the day of her murder, and a screw found in [appellant's] truck that may or may not have come from a gun—doesn't make up the difference. Only by speculation can [appellant] be identified as the murderer.

Specifically, appellant contends (1) while the State "focused most" on "touch DNA matching [appellant] found on a condom in [N.L.'s] bathroom trash can," "a different man's DNA was found inside the condom, and none of the many other samples found in the home matched [appellant]"; (2) in light of the evidence that appellant was "obsessive-compulsive" and "incredibly neat and orderly," it is "far more likely that [appellant's] touch DNA landed on another man's used condom by transference, or contamination"; and (3) "[appellant] lived with [N.L.] when they were engaged to be married" and "[appellant's] DNA could have lingered in the trash can or it could have lingered on the complainant's bedsheets, transferring to the condom there." Additionally, in his reply brief in this Court, appellant asserts in part (1) "a witness saw a truck in front of the complainant's home that matched that of disgraced former Detective Scott Greer"; (2) "[N.L.'s] neighbor heard two loud 'booms' at a time when [appellant] had an alibi"; and (3) "the State ignores the very nature of transference; just as [appellant's] touch DNA could have transferred from the complainant's bedsheets to a used condom, it could have transferred from something else to the bedsheets." In support of his arguments, appellant cites *Winfrey*, 393 S.W.3d at 763, and *Ingerson v. State*, 508 S.W.3d 703 (Tex. App.—Fort Worth 2016, pet. granted), both of which are capital murder cases in which the jury's verdict was reversed on appeal based on insufficient evidence.

The State argues that "[a]lthough the evidence was circumstantial, the combined and cumulative effect of the incriminating evidence pointed to [appellant's] guilt,"

20

and "[t]hus, a rational trier of fact would have found guilt beyond a reasonable doubt." Specifically, the State asserts, "The victim expressed concern that [appellant] was going to kill her because she reported the sexual assault, DNA evidence connected [appellant] to the victim's home where she had moved in an effort to hide from [appellant], [appellant] had tracked the victim to that home, and [appellant] had photographs of and an empty case for handguns like that used to kill the victim."

In *Winfrey*, a murder victim was found in his home with numerous stab wounds and multiple blunt-force injuries. *See* 393 S.W.3d at 764. Megan Winfrey attended the high school where the victim worked and was acquainted with him. After an investigation that included dog-scent lineups, Winfrey and her father and brother were charged with the murder. *Id.* at 765. A jury convicted Winfrey of "capital murder during the course of robbery" and "conspiracy to commit capital murder." *Id.* The trial court's judgment was affirmed by the court of appeals. *Id.* However, the Texas Court of Criminal Appeals reversed the court of appeals and rendered acquittals on both counts. *Id.*

In her appeal to the court of criminal appeals, Winfrey argued that unless the dog-scent lineup evidence was treated as "primary evidence," there was "no evidence which implicates [Winfrey] in this murder either directly or by application of the law of parties." *Id.* at 767. The court of criminal appeals stated in part (1) in a prior opinion respecting Winfrey's father's involvement in the same murder, "[w]e concluded that dog-scent lineups, 'when used alone or as primary evidence, are legally insufficient to support a conviction,'" *id.* at 768 (quoting *Winfrey v. State*, 323 S.W.3d 875, 884 (Tex. Crim. App. 2010) (hereinafter "*Richard Winfrey*")); (2) although dog-scent lineup evidence "is properly considered in a review of the sufficiency of the evidence," the role of such evidence "is merely supportive," *id.* at 770; and (3) "[w]e do observe that the dog-scent lineup evidence, with the dog alerting to [Winfrey's] scent on [the victim's] clothing, simply indicates that [Winfrey] had had some contact with [the victim's] clothing, although the timing, circumstances, and degree of that contact cannot be determined," *id.* at 768. Then, that court conducted a review of "all of the evidence in the light most favorable to the verdict," with the dog-scent lineup evidence being "'merely supportive' of the remainder of the evidence." *Id.* at 770.

The evidence considered by the court of criminal appeals included testimony that (1) "[Winfrey] believed that [the victim] had money in his home, and she wanted it"; (2) Winfrey's father related specific information about the murder to his jail cell-mate, Campbell, including that one of the father's children had let the father into the house, that the victim had been stabbed repeatedly, and that guns had been stolen from the house, "whereupon law-enforcement officials, who had not known that guns were missing, then talked to [the victim's] relatives and confirmed that guns were missing"; (3) "when [Winfrey] heard that her brother had been arrested for the murder, she asked her boyfriend to take her to her ex-husband's house, allegedly to discuss their daughter, but instead discussed only a possible alibi for

21

the night of the murder"; (4) "after her ex-husband was subpoenaed, [Winfrey] called his mother to find out if he was going to testify"; (5) "when [Winfrey] learned that law-enforcement personnel had found a pubic hair at the crime scene, she shaved herself, allegedly to prevent the taking of a sample of her pubic hair"; (6) "[Winfrey] told her boyfriend that she went to [the victim's] house because 'it was an easy lick,' which the boyfriend construed to mean [Winfrey] thought she would get money"; and (7) "there was a drop of blood underneath and a drop on top of the overturned vacuum cleaner in the closet," which the State suggested "allowed the trier of fact to 'draw the inference that these drops and their positioning could have occurred when the murderer was in the closet taking the guns and looking for items to steal.'" *Id.* at 770-71.

The court of criminal appeals stated that evidence appeared "more speculative than inferential" as to Winfrey's guilt because (1) "[Winfrey's] expression of knowledge that [the victim] had money in his home that she wanted and that she went to his house because 'it was an easy lick' does not reveal any action on her part to actually kill [the victim] and take his money, and it is even less incriminatory when we consider that the police investigation was unable to determine that any money had been taken from [the victim] during the course of the murder"; (2) Campbell did not state which one of the Winfrey children had purportedly let Winfrey's father into the house and did not "specifically inculpate [Winfrey]"; (3) Campbell's testimony included repeated assertions that Winfrey's father had described to him "how the victim's penis had been cut off and 'crammed into' the victim's mouth," and "[i]f that claim had been fact, it surely would have been noted by the medical examiner, but was not"; (4) there was "no evidence indicating when and under what circumstances" the victim's guns were removed from his home or that such guns were removed during the course of the murder; (5) "[t]he evidence of [Winfrey's] shaving of her pubic hair seems much less significant in light of her unchallenged testimony that she regularly shaved it, her later provision of the requested sample, and the determination that her hair did not match a hair recovered from the scene"; (6) "we do not perceive any indicia of guilt" from "simply discussing a possible alibi for the time of the murder" or "in [Winfrey] contacting her ex-husband's mother to determine whether he was going to testify at trial"; and (7) "[t]he state's suggestion of an appropriate inference drawn from blood drops on the vacuum cleaner supports no connection to [Winfrey] at all because the DNA of those blood drops did not match any of the Winfreys." *Id.* at 771-72. Further, that court stated "[b]asing a finding of [Winfrey's] guilt on this evidence and all of the other evidence is, at best, 'mere theorizing or guessing' about [Winfrey's] possible guilt rather than a reasonable inference based upon evidence and facts presented." *Id.* at 772. The court of criminal appeals concluded, "After reviewing all of the evidence in the light most favorable to the guilty verdict, we hold that the evidence merely raises a suspicion of [Winfrey's] guilt and is legally insufficient to support a conviction of capital murder beyond a reasonable doubt." *Id.* at 772-73.

In *Ingerson*, the bodies of two murder victims, Robyn Richter and Shawna Ferris, were found in Richter's SUV in a restaurant parking lot. *See* 508 S.W.3d at 731.

22

Each victim had a single gunshot wound to the head. *Id.* Fred Ingerson, who was acquainted with both victims, was charged and convicted of capital murder. *Id.* On appeal, the State contended the following "items of evidence" established guilt beyond a reasonable doubt: (1) Ingerson was romantically interested in Richter, but Richter had "disingenuous feelings towards him" and "was using Ingerson's feelings for her own financial gain"; (2) Ingerson's presence at the location and time of the murders; (3) Ingerson's ownership of a gun of the same make and caliber as the murder weapon; (4) the presence of a gun under the driver's seat in Ingerson's vehicle the day after the murders; (5) the presence of gunshot residue under the driver's seat of Ingerson's car and on the pants Ingerson wore the night of the murders; (6) Ingerson's alleged "suspicious activity" following the murders; and (7) "incriminating statements" by Ingerson to police and others. *Id.* at 732.

The court of appeals reasoned in part (1) the evidence showed only a "friendly" relationship between Ingerson and Richter and "[n]o evidence supports the State's contention that Ingerson was driven to murder because he was offended by Richter's conduct towards him"; (2) Ingerson's presence outside the restaurant and being the last person seen with Richter and Ferris "without more, is insufficient to sustain a conviction as a party to the offense"; (3) testing "definitively ruled out any Smith & Wesson as the murder weapon," but showed the murder weapon could have been a Colt revolver; (4) "the State itself established that the .38 Colt bobbed-hammer pistol once owned by Ingerson was not the murder weapon"; (5) because the witness who saw a gun in Ingerson's vehicle originally testified it was a Smith & Wesson that had a "hammer," then stated a year later that the gun was a Colt "bobbed-hammer" pistol, that testimony "fall[s] short of proof beyond a reasonable doubt that the murder weapon was under the seat of Ingerson's car" on the date of the murders; (6) the gunshot residue in Ingerson's car and on his pants could be explained by the presence of a gun in his vehicle and "was not directly linked in any way to the murders"; and (7) although Ingerson was "confused as to the time that he actually left [the restaurant] because he believed that the bar had closed at 11 p.m. instead of midnight," "[t]hat confusion falls short of being incriminatingly suspicious activity." *Id.* at 732-35. That court stated, in summary, (1) "[t]he sole and only fact proven by the State beyond a reasonable doubt is that Ingerson was the last person seen at Richter's vehicle" and (2) the State's other items of evidence "amount to speculation and are not grounded in facts." *Id.* at 736. Then, that court concluded that after reviewing all the circumstantial evidence and any reasonable inferences supportable from that evidence, the evidence was insufficient to support Ingerson's conviction. *Id.*

Unlike *Ingerson*, the case before us includes (1) evidence of motive, (2) evidence of threats and tracking by appellant, and (3) touch DNA of appellant at the crime scene. Also, unlike in *Ingerson*, neither of the .22-caliber firearms shown in the photograph found in appellant's home was excluded as the murder weapon. Therefore, *Ingerson* is distinguishable from the case before us.

23

Further, *Winfrey* did not involve touch DNA evidence, but rather dog-scent lineup evidence. *See* 393 S.W.3d at 767. The court of criminal appeals's conclusion in *Winfrey* was based on its prior opinion in *Richard Winfrey*, which case "pertain[ed] to canines used to discriminate among human scents in order to identify a specific person in a lineup" and presented the question of "whether dog-scent lineup evidence alone can support a conviction beyond a reasonable doubt." *Richard Winfrey*, 323 S.W.3d at 883, 884-85. Specifically, *Richard Winfrey* involved a scent lineup conducted nearly three years after the victim's murder that compared "scent samples" from clothing the victim was wearing at the time of his death to samples from six individuals. *Id.* at 877.

As described by the dissent in the case before us, the court of criminal appeals stated in *Richard Winfrey* that because scent transfers with ease from one person or object to another, "the dog-scent lineup proves only that appellant's scent was on the victim's clothes, not that appellant had been in direct contact with the victim."[3] *Id.* at 881-82. The dissent states, "Accordingly, the court of criminal appeals concluded that there was legally insufficient evidence to support Richard's conviction because even a strong suspicion of guilt is insufficient to convict." However, contrary to the dissent's description of *Richard Winfrey*, the analysis in that case did not end with the court's statements respecting transference. Rather, the court of criminal appeals also stated in part (1) Richard "did not match the DNA profile obtained from the crime scene" and (2) a deputy who testified for the State "recognized the limits of the scent lineup in his testimony when he stated that: 'We never convict anybody solely on the dog. It is illegal in the State of Texas . . . . You cannot convict solely on the dog's testimony.'" *Id.* at 882. Further, the court of criminal appeals specifically summarized the evidence as follows: "At most, the evidence here shows: (1) appellant indicated [during a pre-arrest interview by law enforcement officers] that he believed he was the number one suspect in a murder investigation; (2) appellant shared information with [his jail cellmate] that appellant claimed to have heard about the murder; and (3) appellant's scent was on the victim's clothes." *Id.* Additionally, the dissent entirely omits any mention that the court's analysis in *Richard Winfrey* also addressed "the science underlying canine-scent lineups," which "has been questioned." *Id.* at 882. In reaching its conclusion that "dog-scent lineup evidence alone" is insufficient to establish a person's guilt beyond a reasonable doubt, the court of criminal appeals stated in part that while "[i]n thousands of cases, canines and their handlers have performed with distinction," "we acknowledge the invariable truth espoused by [U.S. Supreme Court] Justice Souter that '[t]he infallible dog, however, is a creature of legal fiction.' " *Id.* at 883-84. Unlike *Winfrey* and *Richard Winfrey*, the case before us does not involve a conviction supported solely by dog-scent lineup evidence. Therefore, we do not find *Winfrey* or *Richard Winfrey* instructive. *See id.*

> [FN3] Additionally, the dissent states that in *Richard Winfrey*, the evidence respecting "transference" included a witness who "analogized scent transference to skin DNA transference that can occur when a person touches someone and that person touches

something else." However, while the evidence in that case included testimony that shaking hands can result in transfer of "skin cells" to a third person upon subsequent contact, there was no testimony respecting any type of "DNA transference." *See id.* at 877 n.4.

As the dissent points out, the touch DNA evidence in the case before us does not show the "timing, circumstances, and degree" of contact from which that evidence resulted. *See Winfrey*, 393 S.W.3d at 768. However, as described above, the record shows (1) appellant was not indicted for the March 2013 sexual assault of N.L. until September 27, 2013; (2) in June 2013, N.L. and her son moved to Melissa "mostly to escape [appellant]"; (3) appellant had threatened to kill N.L. if she testified in the sexual assault case and she was "scared to death" when she believed he had discovered where she lived; (4) in mid-August, a blue tarp and handcuffs similar to those used in the March 2013 sexual assault were left on N.L's front porch; (5) during the week before N.L. was killed, searches were conducted on appellant's work computer under his username to locate GPS coordinates at and around N.L.'s home; (6) N.L. was shot with a .22-caliber handgun sometime between 8 a.m. and 4:30 p.m. on September 9, 2013; (7) on that date, the front door was unlocked when N.L.'s son arrived home from school, screws possibly were missing from the latch on N.L.'s bedroom window, and a neighbor saw a person slouched down in a truck sitting in front of N.L.'s house at 8:15 a.m.; (8) although the truck seen by the neighbor matched the description of Greer's truck, Greer's time sheets showed he was working at that time; (9) appellant stopped using his cell phone several days before the date N.L. was killed and resumed cell phone use at 11:13 a.m. on the date of the killing; (10) appellant did not have a confirmed alibi for that morning; (11) during a search of appellant's home, police found a photograph of a gun case containing two .22-caliber firearms, with suppressors; (12) in a storage unit leased by appellant's ex-wife, police found a gun case similar to the case in that photograph that contained one suppressor, but no .22-caliber firearms; (13) during a search of appellant's truck, police found a small screw on the front floorboard that was similar to the type used in guns; (14) at the crime scene, appellant's touch DNA was found on the outer-facing surface of a condom that was sitting atop "fresh trash" in the master bathroom wastebasket, which was lined with a plastic liner; and (15) although multiple items from the crime scene were tested, no other DNA of appellant was found at the scene.

"In circumstantial evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple*, 390 S.W.3d at 359 (quoting *Johnson*, 871 S.W.2d at 186). On this record, considering all of the evidence in the light most favorable to the verdict, we conclude that, based on that evidence and reasonable inferences therefrom, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See id.* at 361; *see also Merritt*, 368 S.W.3d at 527 (reversing court of appeals' conclusion of insufficient evidence because court of appeals "improperly acted as a thirteenth juror when it speculated and focused

25

on the existence of a reasonable hypothesis inconsistent with the guilt of the accused, thereby repudiating the jury's prerogative to weigh the evidence, to judge the credibility of the witnesses, and to choose between conflicting theories of the case").

We note that the dissent focuses heavily on the fact that "DNA can be transferred from one source or location to another source or location" and "finding a person's DNA at a location . . . does not prove how or when the DNA got there." According to the dissent, "This is notable given the undisputed fact that N.L. had previously lived with appellant in his house and had moved her belongings from there to the house where she was shot." However, the record (1) is silent as to when N.L. and appellant lived together and as to what belongings she retained after moving out of his home, and (2) shows N.L. lived in at least one other location in Frisco between the time she lived with appellant and the time she moved to the house in Melissa. Further, the dissent does not expressly consider the evidence showing (1) DNA evidence can "decrease with washing"; (2) the green condom containing appellant's touch DNA was found atop "fresh trash" in a trash can with a plastic liner; and (3) although multiple items from the crime scene were tested, no other DNA of appellant was found at the scene.

Additionally, the dissent states "it is undisputed that appellant was required to give up his guns after his sexual assault arrest and the gun case was found locked up in his ex-wife's off-site storage unit." However, although Mankin testified appellant "had been ordered to get rid of his guns" pursuant to the protective order obtained by N.L., no evidence in the record specifically addresses whether he did so.

As described above, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper*, 214 S.W.3d at 16. Because the evidence in the record supports conflicting inferences respecting appellant's presence at the crime scene, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Merritt*, 368 S.W.3d at 525-26. On this record, we cannot agree with the dissent that the jury acted irrationally in finding the essential elements of the charged offense beyond a reasonable doubt. *See id.*

We decide against appellant on his first issue.

*Adams*, No. 05-16-01361-CR, 2018 WL 2355280, at *10-16. When raised to the TCCA on direct appeal, that court refused Petitioner's PDR. *Adams v. State*, PDR No. 0637-18. Such refusal is an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Claims of "no evidence" or insufficient evidence to support a conviction are reviewed under the legal-sufficiency standard set out in *Jackson v. Virginia*. This standard requires only that

a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000); *Norris v. Davis*, 826 F.3d 821, 833 (5th Cir. 2016). This standard is applied with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Dupuy*, 201 F.3d at 589 (quoting *Jackson*, 443 U.S. at 324 n.16). As a result, a federal habeas court "may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claims of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991). Consideration of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of witnesses, as those determinations are the exclusive province of the factfinder. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *Marler v. Blackburn*, 777 F.2d 1007, 1012 (5th Cir. 1985). All credibility choices and conflicting inferences are to be resolved in favor of the factfinder's verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005); *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994). A federal habeas court is not authorized to substitute its interpretation of the evidence for that of the factfinder. *Marler*, 777 F.2d at 1012; *Alexander*, 775 F.3d at 598. Moreover, where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993). As stated by the Supreme Court:

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a

27

> sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ___ 130 S. Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

On direct appeal, the Fifth District Court of Appeals thoroughly reviewed the evidence, properly applied the *Jackson* standard, and found the evidence was sufficient to support the trial court's finding that Petitioner murdered the victim. The weight to be given the evidence and trial testimony was the sole province of the jury as the factfinder; it was not for the appellate court to reweigh the evidence. Petitioner relies on the dissenting opinion of the Fifth District Court of Appeals to argue the evidence was insufficient to support his conviction. Petitioner's claim, however, is simply a disagreement with the jury's resolution of alleged conflicts in the evidence, and as such, is foreclosed by settled principles of appellate review. *See United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999) (in reviewing sufficiency of the evidence, a court "must accept credibility choices that support the jury's verdict, and . . . may not reweigh the evidence."). Although the jury could have drawn inferences in Petitioner's favor and/or made different credibility determinations and returned a finding of not guilty, *Jackson* requires that inferences be drawn in favor of the verdict when a challenge to the sufficiency of the evidence is asserted.

Furthermore, the Fifth District Court of Appeals' opinion concerning the circumstantial nature of the evidence against Petitioner is not contrary to, or an unreasonable application of, clearly established law. Indeed, Supreme Court case law is clear that circumstantial evidence suffices to support a criminal conviction. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that, in criminal cases, circumstantial evidence is

"intrinsically no different from testimonial evidence"). The Court cannot ignore or reweigh the circumstantial evidence presented or ignore the rational inferences that could be drawn from the circumstantial evidence presented at trial; that would not be a proper application of the *Jackson* standard.

Affording due respect to the role of the jury and the state courts, the Court finds the evidence at Petitioner's trial was not nearly sparse enough to sustain a due process challenge under *Jackson*. The evidence was sufficient under Texas law to convict Petitioner of capital murder. Above all, Petitioner has not shown the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See Williams*, 529 U.S. at 402-03; *Childress v. Johnson,* 103 F.3d 1221, 1224-25 (5th Cir. 1997). Petitioner has failed to show the state court decision was objectively unreasonable. *See Johnson*, 566 U.S. at 651. Accordingly, Ground One should be denied.

## B. Ineffective Assistance of Counsel Claim (Ground Two)

In Ground Two, Petitioner argues he received ineffective assistance of counsel when trial counsel failed to object to the admission of "touch DNA" evidence under Texas Rule of Evidence 403. (Dkt. #1, p. 6; Dkt. #3, pp. 18-28).

A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687.

Under the first *Strickland* prong, the petitioner must show counsel's performance was deficient. *Id.* To establish deficient performance, he must show "counsel's representation fell below an objective standard of reasonableness," with reasonableness examined under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The *Strickland* court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . .

*Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong of the *Strickland* test, the petitioner must show his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Reviewing Petitioner's ineffective assistance of counsel claim through the lens of the AEDPA means that he has a higher bar to exceed in order to prevail. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Moreover, unreasonableness under *Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The Court must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) ("[C]ounsel is not required to make futile motions or objections." (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)); *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (failure to make frivolous objections does not cause counsel's performance to fall below an objective level of reasonableness); *Emery v.*

31

*Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (a futile or meritless objection cannot be grounds for a finding of deficient performance); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Even with a sound basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a failure to object may be a matter of trial strategy as to which courts will not second guess counsel). Furthermore, a determination of ineffectiveness depends on whether an objection would have been sustained had it been made. *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987).

A petitioner's allegations of ineffective assistance of counsel must be supported by the record. *United States v. Johnson*, 679 F.2d 54, 58-59 (5th Cir. 1982). Even when liberally construing *pro se* pleadings, "mere conclusory allegations on a critical issue . . . are insufficient to raise a constitutional issue." *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018) (citation omitted). More specifically, conclusory statements are insufficient to sustain a claim of ineffectiveness. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001); *see also Green*, 160 F.3d at 1042 ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

Plaintiff alleges trial counsel rendered ineffective assistance by failing to object to "touch DNA" evidence under Texas Rule of Evidence 403. Petitioner argues the evidence had limited probative value and was likely to confuse or mislead the jury. Petitioner raised the issue in his state habeas application. In support of the claim, Petitioner retained Dr. Dan E. Krane to "consider and comment upon the subject of contamination/transfer following DNA testing by the Texas Department of Public Safety Crime Laboratory" of the "swabbing from outside of a green condom

32

from the bathroom trash." (Dkt. #10-87, p. 62, ¶ 5; Dkt. #10-88, pp. 20-21). In a report (Dkt. #10-88, pp. 20-25) attached to Petitioner's state habeas application, Dr. Krane opined as to transfer and contamination:

> Even under the very best of circumstances, the presence of a DNA profile says nothing about the time frame or circumstances under which a DNA profile came to be associated with an item. Further complicating matters, the presence of a DNA profile also does not provide us with insight into the mode of transfer of DNA from its original source to its current location, i.e., primary vs. secondary vs. tertiary transfer. For instance, DNA profiles found to be associated with items of evidence could have been transferred prior to, during, and even after the items of evidence have been collected directly from its source or via an intermediary(s) of its original source (secondary, tertiary transfer). This type of transfer has also been referred to as contamination or the introduction of additional DNA onto a sample through a mechanism other than primary deposition from the original source. It is now common knowledge that indirect transfer has been observed in such that secondary and possibly tertiary transfer should be considered (van Oorschot, 2010, Investig. Genet.). Quite simply, even if one's DNA is found to be associated with an article of evidence, questions arise regarding both how and when that DNA was transferred. This problem is exacerbated by the inability to determine the tissue source of the biological material obtained from low level samples. Further, the chance of "innocent" or incidental DNA transfer greatly increases as the amount of starting material for DNA profiling tests becomes smaller. However, recent studies have shown that neither "the quantity of DNA recovered nor the quality of DNA profile obtained can be used to reliably infer the mode of transfer by which the DNA came to be on the surface of interest. (Meakin, 2013 FSI: Genetics).

(Dkt. #10-88, pp. 24-25). As to the DPS analyst's handling of evidence from the sexual assault case and murder case on the same day, Dr. Krane opined that "best practice to prevent contamination would have been for the laboratory to evaluate these two samples separated by time and space." (Dkt. #10-88, p. 25).

In response to Petitioner's state habeas application, lead defense counsel Steven Miears ("Counsel Miears") and co-counsel Keith Gore ("Counsel Gore," together with Counsel Miears, "trial counsel") submitted affidavits addressing Petitioner's claim. (Dkt. #10-88, pp. 59-66, 68-75). In their affidavits, they stated it was their strategy not to make "unwarranted objections." (Dkt. #10-88, p. 65, ¶ 19, p. 73, ¶ 19). Trial counsel also explained their "theory and strategy" regarding

the DNA evidence on the green condom was "[t]hat the source of the DNA was not the Defendant," but "[i]f it was the Defendant's then its presence was not associated with the murder." (Dkt. #10-88, pp. 63-64, ¶ 18, p. 72, ¶ 18).

The state habeas court found trial counsel were officers of the court, well known to the court, and credible. (Dkt. #10-88, p. 122, ¶¶ 1, 3). The court also found their affidavits to be credible. (Dkt. #10-88, p. 122, ¶¶ 2, 4). With respect to Dr. Krane's affidavit, the state habeas court found:

> Even if the factual assertions in Dr. Dan E. Krane's affidavit are true, the facts contained in the affidavit are not dispositive of the issues raised in the application for writ of habeas corpus because Applicant is not claiming that counsel was ineffective for not calling an expert. The Court should only examine the evidence available to the trial court at the time the objection was alleged to have been made, and Applicant has not explained how the information in the affidavit differed from the evidence presented at trial[.]

(Dkt. #10-88, p. 122-23, ¶ 5). The state habeas court, citing *Strickland* (Dkt. #10-88, p. 123, ¶ 6), then made the following findings and conclusions of law regarding Petitioner's claim that trial counsel was ineffective for failing to object to "touch DNA" evidence under Texas Rule of Evidence 403:

7. Applicant argues that trial counsel was ineffective because he did not object to the admission of "touch-DNA" under Texas Rule of Evidence 403;

8. At trial, A.J. Jumper, a criminal investigator for the Collin County Sherriff's Office, testified that the wastebasket in which the green condom was found was located next to the toilet in the master bathroom. *Adams v. State*, No. 05-16-01361 CR, 2018 WL 2355280, *4 (Tex. App.—Dallas May 24, 2018, pet. ref'd) (not designated for publication); 6 RR 164;

9. He testified the wastebasket was small and had "a plastic liner in it, kind of like a garbage can liner." *Adams*, 2018 WL 2355280, at *4;

10. He stated that at the time he first saw the wastebasket, it was more than halfway filled with trash. *Id.*;

11. The edge of the green condom could be seen near the top of that trash before any of the items of trash were moved. *Id.*;

12. Photographs of the wastebasket as it appeared before any of the items of trash were moved were published to the jury. *Id.*;

13. During Jumper's testimony, the State introduced State's Exhibit 35, the green condom, without objection. 6 RR 168-69;

14. During Kimberlee Mack's testimony, the State offered her report containing the DNA test results, without objection. 8 RR 139;

15. During the testing she conducted, she concluded that the inside of the green condom contained a mixture of three DNA profiles and she could not exclude Applicant as a contributor to one of the profiles. 6 RR 166-68. There was no objection to this testimony;

16. On cross-examination, Mack testified (1) the DNA from the March 2013 sexual assault described above was not analyzed until after the September 2013 homicide occurred; (2) the presence of a person's DNA in a location "doesn't mean that person was there" or "tell us how it got there"; (3) it is possible DNA can be "picked up" by items that touch it and deposited from those items onto other surfaces; (4) depending on variables such as temperature, DNA can remain on an item "years and years after it was left there"; and (5) contamination of DNA from one case with DNA from another case can occur in a lab. *Adams*, 2018 WL 2355280, at *7;

17. Amber Moss testified that she performed a "re-analysis and reinterpretation" of the evidence from both crimes described above, using "newer techniques" than were used in the original analyses. *Id.*, at *8;

18. Moss testified that although the analysis of the DNA on the outwardfacing surface of the green condom "looked like it was potentially a three-person mixture," it "possibly is a four-person mixture" and "we don't know which it truly is." *Id.*;

19. She stated that, regardless, her testing indicated N.L. and Applicant are two of the persons whose DNA is in that mixture. *Id.*;

20. There were no objections to Moss's reports or her testimony regarding her reports. 9 RR 22, 28-29;

21. Defense expert Dr. Greg Hampikian testified he is a biology professor at Boise State University and does "private DNA consulting." *Adams*, 2018 WL 2355280, at *9;

22. He stated that through "transfer," it is "possible for DNA from someone to appear in a location where that person has never ever been." *Id.;*

23. Additionally, he testified in part as follows:

Q. Now, the idea of transfer from something at the crime scene, for example, like a bedsheet that had been shared by two individuals sometime in the past, and a DNA sample collected from that bedsheet sometime in the future, is it—it is possible that DNA can stay around for a long time on like a sheet or something like that?

A. Yeah. I mean, I have—so I have casework that's, as I said 20, 30 years old. DNA does stay around. Now, if something is washed in really good detergent and bleach, you're probably going to get rid of most of the DNA. That doesn't mean it might not show up by the time you get it to the lab. It might touch the washing machine on the way out where some dirty clothes hit the rim and your clean sheet hits it. It's very hard to keep things completely free of DNA even in the lab where we're scrubbing and we're spraying bleach, et cetera. But that's not to say that it doesn't decrease with washing.

. . . .

Q. All right. Ask you to assume something in regards to the trash can. That it had been used over a period of time that included a time period when the homicide occurs and included a time period before that when two people use the same trash can. Is there a likelihood or is there ability for DNA to have survived in a trash can and then it to be transferred to an item that later gets in the trash can?

. . . .

A. Yeah, I mean, in bedrooms and bathrooms and just common sense that's where we put a lot of our biological material. So if you have a sexually active couple, there are 360 billion sperm cells in an ejaculate. Not all of them walk out of that room. Some of them end up on sheets, some of them end up on Kleenex, some of them end up on condoms. And so certainly bedrooms and bathrooms, we see a lot of biological staining in baskets. . . . Not many of us bleach our garage [sic] receptacles and if you have a wet stain and if it has blood or saliva or semen or mucus on it, it transfers quite easily. We've all seen wet tissue stick to a surface.

36

> So there's a lot of transfer that would occur in garbage cans, particularly those that are in bedrooms or bathroom.

*Id.*, at \*9-10.

24. During closing arguments, trial counsel argued: "You get -- that green condom is so screwed up in evidence that it should not be considered by you by anything other than evidence that they make mistakes. And even it's a mixture of all these different people. And it in itself has what on it? It's got Mike Adams's what kind of DNA? Touch DNA. A molecule among skin cells. How easily could that contamination occur? Like that. And you know that piece of evidence is worthless because who's in the inconclusives? Her son, Steve Leger. No reason for his DNA to be inconclusive about whether it's on a condom or not. It's ridicules (sic). That green condom needs to go away in the sense that it's unreliable evidence. It's back to the CSI effect. Put it in a computer, we're going to let a robot do it, we're going to spit out who you want." 11 RR 31-32 (attached to Applicant's application for writ of habeas corpus as Appendix 6);

25. In order to succeed with an ineffective-assistance-of-counsel claim based on counsel's failure to object, one "must show that the trial judge would have committed error in overruling such objection." *Ex parte Parra*, 420 S.W.3d 821, 824-25 (Tex. Crim. App. 2013);

26. Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. See Tex. R. Evid. 403. It favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). An analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. *See Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012);

27. Applicant has not identified when counsel should have objected or to which evidence trial counsel should have objected. There was numerous evidence regarding the green condom presented at trial (including finding, documenting, and testing) but Applicant has failed to identify what particular piece or pieces of evidence that trial counsel should have objected to;

28. Applicant argues that the evidence regarding the green condom had limited probative value and that evidence of the "touch DNA" was likely to confuse or mislead the jury;

29. "Confusion of the issues," refers to a tendency to confuse or distract the jury from the main issues in the case. *Gigliobianco v. State*, 210 S.W.3d 637, 641

(Tex. Crim. App. 2006). Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues. *Id.*;

30. "Misleading the jury," refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. *Id.* For example, "scientific" evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence. *Id.*;

31. The Court of Appeals stated in their opinion, that "[T]he record (1) is silent as to when N.L. and [Applicant] lived together and as to what belongings she retained after moving out of his home, and (2) shows N.L. lived in at least one other location in Frisco between the time she lived with [Applicant] and the time she moved to the house in Melissa. Further, the dissent does not expressly consider the evidence showing (1) DNA evidence can "decrease with washing"; (2) the green condom containing [Applicant]'s touch DNA was found atop "fresh trash" in a trash can with a plastic liner; and (3) although multiple items from the crime scene were tested, no other DNA of [Applicant's] was found at the scene." *Adams*, 2018 WL 2355280, at *15;

32. The DNA evidence on the green condom showed that Applicant had recently been to N.L.'s house;

33. The evidence had probative value;

34. In addition to hearing evidence regarding the significance of the presence of Applicant's DNA on the green condom, the jury also heard testimony regarding the nature of touch DNA, that DNA cannot tell a person how or when it got on the evidence, and that DNA can last for years. The defense presented their own expert and argued that the jury should not even consider the DNA evidence from the green condom;

35. The jury was properly equipped to judge the probative force of the DNA evidence and there was very little danger that the jury would be confused or mislead regarding the probative force of the evidence;

36. The jury was not confused or misled by the DNA evidence;

37. The trial court would not have erred in overruling an objection to the admission of this evidence under Rule 403;

38. Applicant has failed to meet his burden of proof by a preponderance of the evidence that counsel was deficient for not raising this objection or that the outcome of trial would have been different had counsel made this objection;

39. Applicant argues that an objection would have been successful because the Court of Criminal Appeals has expressed concern over touch DNA;

40. In support of his argument, Applicant directs this Court to *Dunning v. State*, 572 S.W.3d 685, 693 (Tex. Crim. App. 2019) and *Reed v. State*, 541 S.W.3d 759 (Tex. Crim. App. 2017);

41. Neither of these cases involve the admissibility of touch DNA evidence nor Rule 403;

42. Instead both discuss DNA in the context of post-conviction DNA testing under Chapter 64 of the Texas Code of Criminal Procedure—*Dunning* involved a review of favorability findings under article 64.04 and *Reed* involved a review of the denial of post-conviction DNA testing;

43. Applicant does not point to any case law that shows that evidence regarding touch DNA per se lacks any probative value;

44. Applicant argues that exclusion of the DNA evidence under Rule 403 was appropriate because of the "significant likelihood of contamination";

45. Applicant's argument appears to be that because evidence from the prior sexual assault was tested the same day as evidence from the murder scene, it is likely that the green condom was contaminated;

46. It was established at trial, however, that if Applicant's sperm and semen from the sexual assault kit had been transferred to the green condom, the analyst would have detected Applicant's sperm or semen on the green condom, and that was not detected in this case. 8 RR 218-20; 9 RR 50;

47. Applicant further argues that the admission of the DNA evidence was prejudicial because it was the "smoking gun" that jurors wish to see and, citing the dissenting opinion from the Court of Appeals in this case, it was the evidence the State primarily relied on to place Applicant at the crime scene when the shooting occurred;

48. Applicant ignores, however, that the majority opinion in this case enumerated several pieces of evidence, in addition to the green condom, in holding that the evidence in this case was sufficient to prove that Applicant committed the murder;

49. "[T]he record shows (1) [Applicant] was not indicted for the March 2013 sexual assault of N.L. until September 27, 2013; (2) in June 2013, N.L. and her son moved to Melissa 'mostly to escape [Applicant]'; (3) [Applicant] had threatened to kill N.L. if she testified in the sexual assault case and she was 'scared to death' when she believed he had discovered where she lived; (4) in

mid-August, a blue tarp and handcuffs similar to those used in the March 2013 sexual assault were left on N.L.'s front porch; (5) during the week before N.L. was killed, searches were conducted on [Applicant's] work computer under his username to locate GPS coordinates at and around N.L.'s home; (6) N.L. was shot with a .22-caliber handgun sometime between 8 a.m. and 4:30 p.m. on September 9, 2013; (7) on that date, the front door was unlocked when N.L.'s son arrived home from school, screws possibly were missing from the latch on N.L.'s bedroom window, and a neighbor saw a person slouched down in a truck sitting in front of N.L.'s house at 8:15 a.m.; (8) although the truck seen by the neighbor matched the description of Greer's truck, Greer's time sheets showed he was working at that time; (9) [Applicant] stopped using his cell phone several days before the date N.L. was killed and resumed cell phone use at 11:13 a.m. on the date of the killing; (10) [Applicant] did not have a confirmed alibi for that morning; (11) during a search of [Applicant]'s home, police found a photograph of a gun case containing two .22-caliber firearms, with suppressors; (12) in a storage unit leased by [Applicant]'s ex-wife, police found a gun case similar to the case in that photograph that contained one suppressor, but no .22-caliber firearms; (13) during a search of [Applicant]'s truck, police found a small screw on the front floorboard that was similar to the type used in guns; (14) at the crime scene, [Applicant]'s touch DNA was found on the outerfacing surface of a condom that was sitting atop "fresh trash" in the master bathroom wastebasket, which was lined with a plastic liner; and (15) although multiple items from the crime scene were tested, no other DNA of appellant was found at the scene." *Adams*, 2018 WL 2355280, at *15[.]

(Dkt. #10-88, pp. 123-34, 138). The TCCA denied relief without written order, which was an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

A review of the record fails to show the state court's determination of this issue was in conflict with established federal law or was objectively unreasonable, and nothing in the record rebuts the presumption of factual correctness of the state court's findings with clear and convincing evidence. Texas Rule of Evidence 403 states relevant evidence may be excluded if its probative value is substantially outweighed by a danger of confusing the issues and misleading the jury. Petitioner has not shown "touch DNA" evidence per se lacked probative value or was per se inadmissible under Rule 403. Here, the "touch DNA" evidence was probative because it connected Petitioner to the victim's house. Importantly, the "touch DNA" evidence was accompanied by other evidence from which the jury could evaluate the meaning of the "touch DNA" result. The

jury heard testimony regarding the nature of "touch DNA"; specifically, that "touch DNA" cannot tell how or when it got on the evidence and that DNA can last for years. The defense presented their own expert and argued the jury should not even consider the DNA evidence from the green condom, and in closing, trial counsel argued, "[t]hat green condom needs to go away in the sense that it's unreliable evidence." Thus, as the state habeas court concluded, the jury was properly equipped to judge the probative force of the DNA evidence and there was very little danger that the jury would be confused or misled regarding the probative force of the evidence. *See McNair v. State*, No. 08-16-00033-CR, 2018 WL 2356405, at *12 (Tex. App. May 24, 2018) (holding that there was little to no danger that the jury was misled or confused about the probative value of the evidence where it was fully equipped to judge the probative value of the evidence).

Petitioner fails to demonstrate trial counsel's decision not to object under Rule 403 was an exercise of unreasonable professional judgment or that, but for this failure to object, the result of the proceeding would probably have been different. *See Emery*, 139 F.3d at 198 (a futile or meritless objection cannot be grounds for a finding of deficient performance). Having not shown deficient performance or prejudice, Petitioner fails to demonstrate the state court's rejection of this claim involved an unreasonable application of, or was contrary to, the established law of *Strickland*. Petitioner has failed to show there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Therefore, Ground Two should be denied.

## C. **Fourth Amendment Claim (Ground Three)**

In Ground Three, Petitioner contends the police officers' warrantless impoundment and inventory search of his truck was unreasonable. (Dkt. #1, p. 7; Dkt. #3, pp. 28-38).

Petitioner's Fourth Amendment claims are foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 494 (1976). In *Stone*, the Supreme Court held that federal courts

41

have no authority to review a state court's application of Fourth Amendment principles in habeas corpus proceedings unless the petitioner was denied a full and fair opportunity to litigate his claims in state court. *Id.*; *see also Bell v. Lynaugh*, 828 F.2d 1085, 1091-92 (5th Cir. 1987) ("We need not spend much time addressing appellant's Fourth Amendment concerns, for appellant does not allege, nor does our independent review of the record indicate, that appellant did not have a full and fair opportunity to litigate his Fourth Amendment claim in state court."). The opportunity, regardless of whether it is acted upon at the state level, is all that is required to preclude federal habeas review. *Smith v. Maggio*, 664 F.2d 109, 111 (5th Cir. 1981). Crucially, even errors in adjudicating Fourth Amendment claims are not an exception to *Stone*'s bar. *See Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006).

Here, Petitioner was provided an opportunity to obtain full and fair litigation of his Fourth Amendment claims in state court. First, Petitioner filed a motion to suppress evidence and was provided a hearing. (Dkt. #10-51, pp. 61-66; Dkt. #10-54, pp. 6-89). Additionally, Petitioner challenged the search on direct appeal. *Adams*, No. 05-16-01361-CR, 2018 WL 2355280, at *16-17. Accordingly, he is precluded from pursuing the claim on federal habeas review and Ground Three should be dismissed.

## V.  CONCLUSION

Petitioner has failed to show his claims have merit. Petitioner has failed to demonstrate the evidence was insufficient under Texas law to support a finding that Petitioner murdered the victim. Additionally, Petitioner has failed to demonstrate trial counsel rendered ineffective assistance under *Strickland* for failing to object to the "touch DNA" evidence under Texas Rule of Evidence 403. Finally, Petitioner's Fourth Amendment claim is foreclosed by *Stone v. Powell*. Above all, Petitioner has failed to show that the state court proceedings resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 402-03, 405-06; *Childress*, 103 F.3d at 1224-25. Petitioner has not shown there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Accordingly, Petitioner's habeas petition should be denied and dismissed.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, it is recommended that the Court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court," noting "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327

F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is recommended reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended the Court find Petitioner is not entitled to a certificate of appealability.

## VII. RECOMMENDATION

It is recommended the above-styled petition filed under 28 U.S.C. § 2254 be denied and the case be dismissed with prejudice. It is further recommended a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district

court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days)

**So ORDERED and SIGNED this 21st day of December, 2023.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE